**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| MIRA SAFETY, LLC<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>BTG INTERNATIONAL, INC., and SERB SA,<br><br>Defendants/Counter-Plaintiffs,<br><br>v.<br><br>ROMAN ZRAZHEVSKIY AND TANYA MIRONOVA,<br><br>Counter-Defendants. | No. 1:24-CV-01363-ADA |

**DEFENDANTS' ANSWER TO MIRA SAFETY LLC'S THIRD AMENDED COMPLAINT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendants BTG International, Inc. ("BTG") and SERB SA ("SERB") file this Answer with Affirmative Defenses and Counterclaims to Plaintiff MIRA Safety LLC's ("MIRA") Third Amended Complaint, expressly subject to and without waiver of or prejudice to BTG's pending Partial Motion to Dismiss, ECF No. 51, SERB's pending Motion to Dismiss, ECF No. 64, and all defenses, objections, and arguments preserved in those motions. Except as otherwise expressly admitted, Defendants deny each and every allegation contained in MIRA's Third Amended Complaint.

**SUMMARY OF DISPUTE**

To the extent any response is required, Defendants deny the allegations in MIRA's Summary of Dispute, except Defendants admit that MIRA purports to assert claims against BTG and SERB for breach of contract, breaches of express and implied warranties, tortious

interference, fraud, promissory estoppel, unjust enrichment, civil conspiracy, and unfair competition. Defendants further state that Defendants' pending Motions to Dismiss seek dismissal of certain claims asserted by MIRA, including Counts 5, 6, 7, 8, 9, and 10.

## PARTIES

1. Upon information and belief, Defendants admit that MIRA is a Texas limited liability company with its principal place of business in Travis County, Texas.

2. BTG admits only that it is a Delaware corporation and that its principal place of business is in Pennsylvania.

3. SERB admits only that it is a Belgian public limited company. Defendants deny any remaining allegations in Paragraph 3.

## JURISDICTION AND VENUE

4. Paragraph 4 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 4.

5. Paragraph 5 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 5.

6. The first sentence in Paragraph 6 states a legal conclusion to which no response is required. BTG admits that goods sold by BTG to MIRA were shipped to and stored by MIRA in Texas.

7. Paragraph 7 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 7.

## FACTUAL ALLEGATIONS

8. Upon information and belief, Defendants admit the allegations in Paragraph 8.

9. Defendants admit that SERB manufactures and distributes potassium iodide products under the brand name "Thyrosafe."

10. Defendants admit that BTG distributes Thyrosafe in the United States.

11. Defendants lack sufficient information to admit or deny the allegations in Paragraph 11 and therefore deny them.

12. BTG denies the allegations in Paragraph 12.

13. BTG admits only that MIRA purchased Thyrosafe from BTG in 2022. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 13 and therefore deny them.

14. BTG admits only that MIRA purchased Thyrosafe from BTG in 2022. Defendants deny the remaining allegations in Paragraph 14.

15. Defendants deny the allegations in Paragraph 15.

16. Defendants admit only that MIRA purchased Thyrosafe from BTG in 2022. Defendants deny the remaining allegations in Paragraph 16.

17. Defendants deny the allegations in Paragraph 17.

18. Defendants deny the allegations in Paragraph 18.

19. Defendants deny the allegations in Paragraph 19.

20. Defendants deny the allegations in Paragraph 20.

21. Defendants lack sufficient information to admit or deny the allegations in Paragraph 21 and therefore deny them.

22. Defendants deny the allegations in Paragraph 22. While BTG admits that Lisa Thompson sent a letter to MIRA on November 1, 2022 regarding sales of Thyrosafe in Canada,

that letter is a writing that speaks for itself. Moreover, the November 1, 2022 letter was sent before the sales of Thyrosafe at issue in this case were made.

23. Defendants deny the allegations in Paragraph 23.

24. Defendants deny the allegations in Paragraph 24.

25. Defendants lack sufficient information at this time and pending discovery to admit or deny the allegations in Paragraph 25 with respect to the details of MIRA's manufacturing and sale of its own potassium iodide products and therefore deny them.

26. BTG denies the allegations in Paragraph 26. By way of further answer, in June 2023, BTG informed MIRA that it was terminating further negotiations regarding a possible distribution agreement with MIRA.

27. Defendants lack sufficient information to admit or deny the allegations in Paragraph 27 regarding what Amazon allegedly notified MIRA and therefore deny them. Defendants deny the remaining allegations in Paragraph 27.

28. Defendants deny the allegations in Paragraph 28.

29. Defendants lack sufficient information to admit or deny the allegations in Paragraph 29 regarding what Amazon allegedly informed MIRA and therefore deny them. Defendants deny the remaining allegations in Paragraph 29.

30. Defendants lack sufficient information to admit or deny the allegations in Paragraph 30 regarding the quantity of Thyrosafe MIRA allegedly holds or the associated valuation of that quantity and therefore deny them. Defendants deny the remaining allegations in Paragraph 30.

## CAUSES OF ACTION

### Claim 1: Breach of Contract

31. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein.

32. Paragraph 32 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 32.

33. Paragraph 33 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 33.

34. Paragraph 34 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 34.

35. Paragraph 35 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 35.

36. Defendants deny the allegations in Paragraph 36.

37. Paragraph 37 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 37.

38. Paragraph 38 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 38.

39. Paragraph 39 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 39.

40. Paragraph 40 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 40.

41. Paragraph 41 does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 41.

**Claim 2: Breach of Express Warranty (in the alternative)**

42. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein.

43. BTG admits that BTG sold Thyrosafe to MIRA. Except as expressly admitted, Defendants deny the allegations in Paragraph 43.

44. Defendants deny the allegations in Paragraph 44.

45. Defendants deny the allegations in Paragraph 45.

46. Defendants deny the allegations in Paragraph 46.

47. Paragraph 47 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 47.

48. Defendants lack sufficient information to admit or deny the allegations in Paragraph 48 and therefore deny them.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50.

51. Paragraph 51 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 51.

52. Paragraph 52 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 52.

53. Paragraph 53 does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 53.

**Claim 3: Breach of Implied Warranty of Merchantability (in the alternative)**

54. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein.

55. BTG admits that BTG sold Thyrosafe to MIRA. Except as expressly admitted, Defendants deny the allegations in Paragraph 55.

56. Defendants deny the allegations in Paragraph 56.

57. Defendants deny the allegations in Paragraph 57.

58. Defendants deny the allegations in Paragraph 58.

59. Paragraph 59 does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 59.

**Claim 4: Breach of Implied Warranty for Particular Purpose (in the alternative)**

60. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein.

61. BTG admits that BTG sold Thyrosafe to MIRA. Except as expressly admitted, Defendants deny the allegations in Paragraph 61.

62. Defendants deny the allegations in Paragraph 62.

63. Defendants deny the allegations in Paragraph 63.

64. Defendants deny the allegations in Paragraph 64.

65. Defendants deny the allegations in Paragraph 65.

66. Paragraph 66 does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 66.

**Claim 5: Tortious Interference with Prospective Business Relations**

67. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 5 is subject to SERB's pending Motion to Dismiss.

68. Defendants deny the allegations in Paragraph 68.

69. Defendants deny the allegations in Paragraph 69.

70. Defendants deny the allegations in Paragraph 70.

71. Defendants deny the allegations in Paragraph 71.

72. Paragraph 72 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 72.

73. Defendants deny the allegations in Paragraph 73.

74. Paragraph 74 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 74.

**Claim 6: Fraud**

75. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 6 is subject to SERB's pending Motion to Dismiss.

76. Defendants deny the allegations in Paragraph 76.

77. Defendants deny the allegations in Paragraph 77.

78. Defendants deny the allegations in Paragraph 78.

79. Defendants deny the allegations in Paragraph 79.

80. Defendants deny the allegations in Paragraph 80.

81. Defendants deny the allegations in Paragraph 81.

82. Defendants deny the allegations in Paragraph 82.

83. Defendants deny the allegations in Paragraph 83.

84. Defendants deny the allegations in Paragraph 84.

85. Defendants deny the allegations in Paragraph 85.

86. Defendants deny the allegations in Paragraph 86.

87. Paragraph 87 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 87.

88. Defendants deny the allegations in Paragraph 88.

89. Paragraph 89 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 89.

**Claim 7: Promissory Estoppel**

90. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 7 is subject to Defendants' pending Motions to Dismiss.

91. Defendants deny the allegations in Paragraph 91.

92. Defendants deny the allegations in Paragraph 92.

93. Defendants deny the allegations in Paragraph 93.

94. Defendants deny the allegations in Paragraph 94.

95. Defendants deny the allegations in Paragraph 95.

96. Defendants deny the allegations in Paragraph 96.

97. Paragraph 97 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 97.

98. Paragraph 98 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 98.

**Claim 8: Unjust Enrichment**

99. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 8 is subject to Defendants' pending Motions to Dismiss.

100. Defendants deny the allegations in Paragraph 100.

101. Defendants deny the allegations in Paragraph 101.

102. Defendants deny the allegations in Paragraph 102.

103. Defendants deny the allegations in Paragraph 103.

104. Defendants deny the allegations in Paragraph 104.

105. Defendants deny the allegations in Paragraph 105.

106. Paragraph 106 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 106.

107. Paragraph 107 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 107.

**Claim 9: Civil Conspiracy**

108. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 9 is subject to Defendants' pending Motions to Dismiss.

109. Defendants deny the allegations in Paragraph 109.

110. Defendants deny the allegations in Paragraph 110.

111. Defendants deny the allegations in Paragraph 111.

112. Paragraph 112 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 112.

**Claim 10: Unfair Competition (Texas Law)**

113. Defendants incorporate the preceding paragraphs by reference as if fully set forth herein. Defendants further state that Count 10 is subject to Defendants' pending Motions to Dismiss.

114. Defendants deny the allegations in Paragraph 114.

115. Defendants deny the allegations in Paragraph 115.

116. Defendants deny the allegations in Paragraph 116.

117. Paragraph 117 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 117.

## CONDITIONS PRECEDENT

1. Paragraph 1 under the heading "Conditions Precedent" does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 1.

## JURY TRIAL

2. Paragraph 2 under the heading "Jury Trial" does not contain factual allegations and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 2.

## PRAYER FOR RELIEF

Defendants deny that MIRA is entitled to any of the relief requested in its Third Amended Complaint or to any relief whatsoever.

## DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden that they would not otherwise bear, and expressly reserving all rights, defenses, and objections, Defendants assert the following affirmative and other defenses:

1. MIRA's claims are barred, in whole or in part, because MIRA failed to state a claim upon which relief can be granted.

2. MIRA's claims are barred, in whole or in part, by the Statute of Frauds.

3. MIRA's claims are barred, in whole or in part, by the doctrine of waiver.

4. MIRA's claims are barred, in whole or in part, because MIRA failed to mitigate its damages.

5. MIRA's claims are barred, in whole or in part, because MIRA failed to provide notice.

6. MIRA's claims are barred, in whole or in part, by MIRA's acceptance of the goods.

7. MIRA's claims are barred, in whole or in part, because MIRA's own acts or omissions caused or contributed to MIRA's alleged injuries.

8. MIRA's claims are barred, in whole or in part, by the doctrine of legal justification.

9. MIRA's claims are barred, in whole or in part, by the doctrine of laches.

10. MIRA's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

11. MIRA's claims are barred, in whole or in part, by MIRA's assumption of risk.

12. MIRA's claims are barred, in whole or in part, because MIRA prevented, hindered, or rendered impossible Defendants' performance of any alleged contractual obligation.

13. MIRA's claims are barred, in whole or in part, because MIRA cannot establish the existence of an enforceable contract or enforceable contractual obligation supporting its claims.

14. MIRA's claims are barred, in whole or in part, because MIRA cannot establish breach of any enforceable contract or enforceable contractual obligation.

15. MIRA's claims are barred, in whole or in part, because any alleged breach was excused by MIRA's prior material breach of any alleged enforceable contract or contractual obligation.

16. MIRA's claims are barred, in whole or in part, because MIRA cannot establish the existence of any express warranty made by Defendants.

17. MIRA's claims are barred, in whole or in part, because any alleged warranty was disclaimed, limited, modified, or otherwise unenforceable.

18. MIRA's claims are barred, in whole or in part, because MIRA cannot establish breach of any express or implied warranty.

19. MIRA's claims are barred, in whole or in part, because MIRA cannot establish that any alleged statement, representation, omission, promise, or conduct by Defendants was false, misleading, material, actionable, or made with the requisite intent.

20. MIRA's fraud-based claims are barred, in whole or in part, because MIRA cannot establish justifiable reliance.

21. MIRA's claims are barred, in whole or in part, because MIRA cannot establish reasonable reliance or substantial reliance.

22. MIRA's claims are barred, in whole or in part, because MIRA cannot establish proximate cause, producing cause, or any other legally cognizable causal connection between Defendants' alleged conduct and MIRA's alleged damages.

23. MIRA's claims are barred, in whole or in part, because MIRA cannot establish recoverable damages.

24. MIRA's claims are barred, in whole or in part, by the economic-loss rule.

25. MIRA's claims are barred, in whole or in part, because MIRA seeks damages that are speculative, remote, uncertain, unrecoverable, or otherwise not recoverable as a matter of law.

26. MIRA's claims are barred, in whole or in part, because MIRA cannot establish the elements of tortious interference with prospective business relations.

27. MIRA's tortious-interference claim is barred, in whole or in part, because Defendants' alleged conduct was independently justified, privileged, or legally permissible.

28. MIRA's promissory-estoppel claim is barred, in whole or in part, because MIRA cannot establish a clear and definite promise.

29. MIRA's promissory-estoppel claim is barred, in whole or in part, because MIRA cannot establish foreseeable, reasonable, or substantial reliance.

30. MIRA's unjust-enrichment claim is barred, in whole or in part, because MIRA cannot establish that Defendants were unjustly enriched or that Defendants obtained or retained a benefit under circumstances that would make retention unjust.

31. MIRA's unjust-enrichment claim is barred, in whole or in part, because an express contract governs the same subject matter alleged by MIRA.

32. MIRA's civil-conspiracy claim is barred, in whole or in part, because MIRA cannot establish an underlying tort or unlawful act.

33. MIRA's civil-conspiracy claim is barred, in whole or in part, because MIRA cannot establish a meeting of the minds, specific intent, or any actionable agreement to accomplish an unlawful purpose or lawful purpose by unlawful means.

34. MIRA's civil-conspiracy claim is barred, in whole or in part, because MIRA cannot establish that Defendants acted as separate legal actors capable of conspiring under the circumstances alleged.

35. MIRA's unfair-competition claim is barred, in whole or in part, because MIRA cannot establish the elements of any recognized unfair-competition claim under Texas law.

36. MIRA's claims are barred, in whole or in part, to the extent they are duplicative, seek an impermissible double recovery, or are subject to the one-satisfaction rule.

37. MIRA's claims for attorneys' fees, costs, exemplary damages, punitive damages, declaratory relief, interest, or equitable relief are barred, limited, or unavailable, in whole or in part.

38. Defendants reserve the right to plead additional defenses as may be appropriate depending upon facts later revealed during discovery, further investigation, motion practice, or amendment of the pleadings.

## PRAYER FOR RELIEF

For the foregoing reasons, Defendants pray that MIRA's claims be dismissed with prejudice, that MIRA take nothing by its Third Amended Complaint, that Defendants recover their costs and reasonable attorneys' fees to the extent permitted by law, and that Defendants receive all other relief to which they are justly entitled.

## COUNTERCLAIMS

Defendants/Counter-Plaintiffs BTG International, Inc. ("BTG") and SERB SA ("SERB") file these Counterclaims against Plaintiff/Counter-Defendant MIRA Safety LLC ("MIRA"), Roman Zrazhevskiy ("Zrazhevskiy"), and Tanya Mironova ("Mironova" and together with MIRA and Zrazhevskiy, the "Counterclaim Defendants") and state as follows:

## PARTIES

1. BTG is a Delaware corporation with its principal place of business in Pennsylvania.

2. SERB is a Belgian public limited company with its principal place of business in Brussels, Belgium.

3. MIRA is a Texas limited liability company with its principal place of business in Travis County, Texas.

4. Roman Zrazhevskiy is the founder and Chief Executive Officer of MIRA. Mr. Zrazhevskiy resides within this judicial district and his acts and omissions giving rise to his liability in this case occurred in this judicial district.

5. Tanya Mironova is the Chief Technology Officer of MIRA. Along with Mr. Zrazhevskiy, she is responsible for designing and implementing MIRA's website advertising and

product lines. Ms. Mironova resides in this judicial district and her acts and omissions giving rise to her liability in this case occurred in this judicial district.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over these Counterclaims under 28 U.S.C. §§ 1331 and 1338 because Defendants assert a claim arising under the Lanham Act, 15 U.S.C. § 1125(a).

7. This Court has supplemental jurisdiction over Defendants' state-law counterclaims under 28 U.S.C. § 1367 because those counterclaims arise from the same case or controversy as MIRA's claims, including the parties' commercial relationship concerning Thyrosafe and MIRA's competing potassium iodide product.

8. This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between MIRA and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this District because MIRA filed this action in this Court and because a substantial part of the events or omissions giving rise to the claims and counterclaims occurred in this District.

## FACTS COMMON TO ALL COUNTERCLAIMS

10. SERB manufactures and distributes Thyrosafe, an FDA-approved potassium iodide product.

11. BTG distributes Thyrosafe in the United States.

12. MIRA sells emergency preparedness and safety products, including potassium iodide products, to consumers, Amazon purchasers, distributors, wholesale customers, and other market participants.

13. MIRA alleges it had an agreement with BTG giving MIRA the right to distribute Thyrosafe on Amazon and exclusivity on Amazon.

14. While BTG and MIRA engaged in discussions regarding a possible distribution agreement that may have contemplated sales of Thyrosafe on Amazon and/or exclusivity on Amazon in 2022 and into early 2023, BTG terminated the negotiations regarding a possible distribution agreement with MIRA on or about June 15, 2023.

15. BTG denies that it entered into a distribution agreement of any kind with MIRA.

16. BTG further denies that it entered into any distribution agreement granting MIRA exclusive rights to sell Thyrosafe on Amazon, or granting MIRA any other distribution or exclusive distribution rights whatsoever.

17. However, in the alternative, and only to the extent the Court or trier of fact concludes that MIRA had an enforceable distribution or exclusivity agreement with BTG to sell Thyrosafe on Amazon, MIRA materially breached that agreement before BTG allegedly took any action that MIRA contends constituted a breach.

18. Specifically, in early 2023, MIRA began marketing its own competing potassium iodide product.

19. MIRA's competing potassium iodide product is identified on MIRA's website as "Potassium Iodide Tablets - Emergency Radiation Pills."[1]

20. Beginning at least as early as February 2023, MIRA sold and continues to sell its competing potassium iodide product through the same business channels for which MIRA now claims it held exclusive rights to sell Thyrosafe, including Amazon.

[1] *See* MIRA Safety, *Potassium Iodide Tablets* | *Radiation Pills*, MIRA Safety, https://www.mirasafety.com/products/potassium-iodide-ki-tablets (last visited Oct. 15, 2026).

21. MIRA has promoted and continues to promote its competing potassium iodide product through Amazon, MIRA's website, YouTube videos, partnerships with influencers in the emergency preparedness community, and with other advertising and promotional materials and efforts, including at trade shows.

22. MIRA's advertising outside of its website refers consumers to its website for purchases of its potassium iodide tablets.

23. At the same time MIRA has asserted distribution rights associated with Thyrosafe, MIRA was developing, selling, and promoting its competing potassium iodide tablets.

24. At no point did MIRA disclose its development, marketing, or sale of its potassium iodide product to BTG, which BTG learned of from marketing materials MIRA published in late February 2023.

25. On information and belief, MIRA was developing and planning to market its competing potassium iodide product during the period when it alleges BTG agreed to enter into an exclusive distribution agreement to sell Thyrosafe on Amazon.

26. MIRA concealed its development and intention to market its competing potassium iodide product to induce BTG to enter into a distribution agreement with MIRA, to the extent such agreement is determined to have existed.

27. BTG would not have entered into any distribution agreement with MIRA, to the extent such agreement is determined to have existed, that permitted MIRA to sell its potassium iodide tablets or any other product that competes with Thyrosafe.

28. MIRA's conduct deprived Defendants of sales, profits, goodwill, market opportunities, and the benefit of the commercial relationship MIRA contends existed and had induced Defendants to support.

29. MIRA also made specific promises and representations to Defendants regarding purchase volumes for Thyrosafe, including representations concerning exact units, forecasts, order commitments, future demand, and anticipated purchasing requirements.

30. Those representations were made by MIRA representatives, including its founder and CEO, Mr. Zrazhevskiy, and Chief Technology Officer, Ms. Mironova.

31. Zrazhevskiy and Mironova represented that MIRA would devote its efforts to selling Thyrosafe and that it could and would purchase substantial volumes of Thyrosafe from Defendants.

32. Zrazhevskiy and Mironova made and caused MIRA to make those representations to induce Defendants to reorganize and adjust their supply, manufacturing, forecasting, inventory, and distribution arrangements to accommodate MIRA's stated volume demands.

33. Defendants relied on Counterclaim Defendants' volume commitments, forecasts, and representations.

34. In reliance on these promises and representations, Defendants reorganized supply-chain arrangements, increased or adjusted manufacturing runs, allocated inventory to support MIRA, diverted or reserved product and capacity for MIRA, changed or accommodated forecasting and logistics arrangements, and incurred inventory, supply-chain, and related costs.

35. MIRA did not purchase the volume of Thyrosafe it promised, forecasted, represented, or demanded that BTG and SERB make available to it.

36. Instead, MIRA developed and sold its own competing potassium iodide product, promoted that product through distribution channels overlapping with the Thyrosafe market, and ceased its purchase and sale of Thyrosafe.

37. MIRA's competing potassium iodide tablets are not FDA approved.

38. MIRA, Zrazhevskiy, and Mironova nevertheless displayed, published, disseminated, or caused to be displayed, published, or disseminated advertising statements, product imagery and promotional materials containing false and misleading statements that MIRA's potassium iodide tablets are FDA approved.

39. For example, MIRA's webpage and sales portal for its potassium iodide product describes the product as "[p]otassium iodide tablets (known as KI pills)", which are "a potentially life-saving solution for exposure to radioactive iodine (I-131) in the aftermath of a nuclear accident or explosion."

40. In the product "description" for its potassium iodide tablets—immediately following the recommended "Dosing Instructions" and under the subheading "The U.S. Food and Drug Administration on the use of potassium iodide"—MIRA states that "[p]otassium iodide (KI) tablets <u>***are approved by the FDA***</u> for use in radiation emergencies. In the event of a nuclear accident at a nuclear power plant, these tablets can prevent the thyroid gland from absorbing harmful radioactive iodine." (emphasis added).

41. Meanwhile, the images of MIRA's potassium iodide product displayed on its webpage clearly show an FDA insignia on the bottle, but any information on the bottle indicating that statements regarding the product have not been evaluated by the FDA is illegible on the website.

42. Nowhere on the webpage do Counterclaim Defendants explain that MIRA's potassium iodide tablets are not FDA approved.

43. Defendants BTG and SERB's Thyrosafe potassium iodide tablets are FDA approved.

44. Counterclaim Defendants' false and misleading statements regarding FDA approval, including, without limitation, the FDA insignia or FDA-related imagery that appears on the product packaging, appear on MIRA's website product page, in the product image carousel, and, on information and belief, in advertising or promotional materials otherwise distributed by MIRA.

45. Product advertisement videos placed on YouTube by MIRA, Zrazhevskiy, and Mironova link directly to MIRA's webpage for its potassium iodide tablets containing the false and misleading advertising statements regarding FDA approval.

46. Counterclaim Defendants' advertising statements and the surrounding product images and presentation regarding FDA approval are false and misleading because they convey, or are likely to convey, to reasonable consumers that MIRA's potassium iodide tablets are FDA approved when they are not.

47. These false and misleading statements are material because FDA approval is important to reasonable consumers purchasing potassium iodide tablets for emergency radiation preparedness.

48. Indeed, Mr. Zrazhevskiy admitted in email correspondence to BTG that FDA approval is important to at least some customers when purchasing potassium iodide pills.

49. Counterclaim Defendants' false and misleading FDA-related advertising is likely to influence purchasing decisions by causing consumers to believe that MIRA's competing potassium iodide product has the same FDA-approved status as Thyrosafe, which it does not.

50. Counterclaim Defendants' conduct has caused, and will likely continue causing, direct competitive and commercial harm to BTG and SERB.

51. Counterclaim Defendants' conduct has diverted and will likely continue to divert sales away from Thyrosafe and toward MIRA's competing potassium iodide product.

52. This diversion of sales away from Thyrosafe and toward MIRA's potassium iodide product is evidenced by MIRA's own claimed inability to successfully market its remaining inventory of Thyrosafe over the same period of time that Counterclaim Defendants have falsely advertised MIRA's potassium iodide tablets as FDA approved.

53. Counterclaim Defendants' conduct has interfered with Defendants' prospective business relationships with consumers, Amazon purchasers, distributors, wholesale customers, and other participants in the potassium iodide market.

54. As a result of Counterclaim Defendants' conduct, Defendants have suffered damages, including lost sales of Thyrosafe, lost profits, costs incurred to accommodate MIRA's volume demands, inventory costs, supply-chain costs, reputational harm, commercial injury, and other damages to be proven at trial.

**COUNT I**
**BREACH OF CONTRACT (In the Alternative)**
**BTG v. MIRA**

55. BTG incorporates by reference the preceding paragraphs as though fully set forth herein.

56. BTG denies that MIRA had an enforceable agreement to act as BTG's distributor on Amazon.

57. However, in the alternative, and to the extent the Court or the trier of fact concludes that MIRA had an enforceable agreement giving MIRA exclusive rights to sell Thyrosafe on Amazon in the United States, MIRA materially breached that agreement.

58. If such an agreement existed, MIRA was obligated to perform in accordance with its terms, to act in good faith, and to use its best efforts under the Texas Business & Commerce Code to promote the sale of Thyrosafe.

59. If such an agreement existed, per MIRA's allegations, it concerned the exclusive sale and distribution of Thyrosafe on Amazon.

60. Texas Business & Commerce Code § 1.304 provides that every contract or duty within that title imposes an obligation of good faith in its performance and enforcement.

61. Texas Business & Commerce Code § 2.306(b) imposes a duty on buyers in exclusive dealing business relationships for the sale of goods, unless otherwise agreed by the parties, to use their best efforts to promote the sale of the goods.

62. If MIRA had an enforceable agreement to act as the exclusive distributor of Thyrosafe on Amazon, MIRA breached that agreement and its duties under Sections 1.304 and 2.306(b) of the Business & Commerce Code by manufacturing and selling a competing potassium iodide product through the same business channels for which MIRA now claims it held exclusive rights to sell Thyrosafe.

63. MIRA's breach occurred before BTG took any action MIRA alleges constituted a breach.

64. Specifically, MIRA began marketing its competing potassium iodide product no later than February of 2023, before the alleged June 2023 termination of the parties' relationship.

65. On information and belief, MIRA's development and intention to bring to market its competing potassium iodide product significantly predated its February 2023 launch.

66. MIRA has sold or promoted its competing potassium iodide product through Amazon, MIRA's website, and third-party distributor channels while claiming exclusivity for Thyrosafe on Amazon.

67. MIRA's sale and promotion of a competing potassium iodide product was inconsistent with any alleged exclusive-sales arrangement and deprived BTG of the benefit of the bargain.

68. MIRA also breached its obligations of good faith and best efforts in the performance of the alleged agreement by asserting exclusivity rights for Thyrosafe while simultaneously developing, manufacturing, marketing, and selling a competing potassium iodide product.

69. On information and belief, MIRA concealed or failed to disclose its development, sale, and promotion of the competing potassium iodide product while demanding supply-chain, inventory, volume, and exclusivity accommodations from BTG.

70. MIRA's conduct frustrated the purpose of any alleged Amazon exclusivity agreement and undermined the commercial basis for the parties' relationship.

71. MIRA's breach and bad-faith performance have caused BTG damages, including lost sales of Thyrosafe, lost profits, inventory and supply-chain costs, costs incurred to accommodate MIRA's volume demands, and other damages to be proven at trial.

72. BTG is entitled to recover damages from MIRA in an amount to be determined at trial, together with interest, costs, attorneys' fees where recoverable, and all other relief to which BTG is entitled.

**COUNT II**
**PROMISSORY ESTOPPEL (In the Alternative)**
**DEFENDANTS v. MIRA**

73. Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

74. This claim is pleaded in the alternative to Defendants' contract-based theories.

75. MIRA and its representatives, including Zrazhevskiy and Mironova, made promises to Defendants regarding MIRA's intended, forecasted, and committed purchase volumes for Thyrosafe.

76. MIRA's promises included specific representations concerning exact units, forecasts, order commitments, future demand, and anticipated purchasing requirements.

77. MIRA promised that it would devote its efforts to selling Thyrosafe and would purchase substantial volumes of Thyrosafe from Defendants.

78. MIRA knew or reasonably should have known that Defendants would rely on MIRA's purchase-volume promises and forecasts in planning supply, manufacturing, inventory, logistics, and distribution arrangements.

79. MIRA intended for Defendants to rely on those promises.

80. Defendants did rely on those promises.

81. Defendants' reliance was reasonable, foreseeable, and substantial.

82. In reliance on MIRA's promises, Defendants reorganized supply-chain arrangements, increased or adjusted manufacturing runs, allocated inventory to MIRA, reserved or diverted product and capacity, changed forecasting and logistics arrangements, and incurred inventory, supply-chain, and related costs.

83. MIRA failed to purchase the promised, forecasted, represented, or demanded volumes.

84. Instead, MIRA developed, sold, and promoted its own competing potassium iodide product.

85. MIRA's failure to honor its promises caused Defendants damages, including supply-chain costs, inventory costs, lost sales, lost profits, and other damages to be proven at trial.

86. Injustice can be avoided only by enforcing MIRA's promises or awarding Defendants reliance damages and other appropriate relief.

87. Defendants are entitled to recover damages from MIRA in an amount to be determined at trial, together with interest, costs, and all other relief to which Defendants are entitled.

**COUNT III**
**FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)**
**DEFENDANTS v. MIRA, ZRAZHEVSKIY, AND MIRONOVA**

88. Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

89. MIRA advertises, markets, promotes, offers for sale, and sells a competing potassium iodide product identified as "Potassium Iodide Tablets - Emergency Radiation Pills."

90. MIRA's competing potassium iodide product is not FDA approved.

91. Counterclaim Defendants have displayed, published, disseminated, or caused to be displayed, published, or disseminated false and misleading statements and FDA-related advertising imagery claiming that MIRA's potassium iodide tablets are FDA approved.

92. The statements and FDA-related imagery and insignia appear on MIRA's product packaging, website product page, product image carousel, and, on information and belief, other advertising or promotional materials.

93. YouTube advertising videos for the competing potassium iodide product posted by Counterclaim Defendants link directly to MIRA's advertising webpage for the product that contains false and misleading advertising materials stating that it is FDA approved.

94. Counterclaim Defendants' FDA-related statements, imagery, and commercial presentation are false and misleading because they convey, or are likely to convey, to reasonable consumers that MIRA's potassium iodide product is FDA approved – which it is not.

95. Counterclaim Defendants' FDA-related statements, representations, and imagery were made in commercial advertising and/or promotion.

96. Counterclaim Defendants' FDA-related representations and imagery concern the nature, characteristics, qualities, regulatory status, safety, approval status, or commercial attributes of MIRA's potassium iodide product.

97. These FDA-related advertising statements and imagery are material because FDA approval is important to consumers purchasing potassium iodide tablets for emergency preparedness and radiation-exposure purposes.

98. This false and misleading FDA-related advertising has deceived or has a tendency to deceive a substantial segment of its intended audience.

99. This false and misleading FDA-related advertising has influenced or is likely to influence purchasing decisions.

100. MIRA's competing potassium iodide product has been promoted, sold, or transported in interstate commerce.

101. Defendants have been and will likely continue to be injured because of Counterclaim Defendants' false and misleading advertising.

102. Defendants' injuries include lost sales of Thyrosafe, lost profits, diversion of potential customers, loss of goodwill, reputational harm, diminished commercial opportunities, and other damages.

103. Counterclaim Defendants' conduct has caused and will continue to cause irreparable harm unless enjoined.

104. Defendants are entitled to injunctive relief requiring Counterclaim Defendants to remove false and misleading FDA-related imagery and statements, to cease making representations that convey or are likely to convey that MIRA's potassium iodide product is FDA approved, and to take corrective action to dispel the misleading impression created by its advertising.

105. Defendants are also entitled to corrective advertising, disgorgement of MIRA's profits, damages, costs, attorneys' fees to the extent permitted by law, and all other relief available under the Lanham Act.

**COUNT IV**
**FRAUD/FRAUDULENT INDUCEMENT**
**DEFENDANTS v. MIRA, ZRAZHEVSKIY, AND MIRONOVA**

106. Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

107. MIRA, through its representatives, including Zrazhevskiy and Mironova, made material representations to Defendants concerning MIRA's intended, forecasted, and committed purchase volumes for Thyrosafe.

108. Counterclaim Defendants' representations included statements concerning exact units, forecasts, order commitments, future demand, and MIRA's intent to devote its efforts to selling Thyrosafe, including the following:

a. On March 24, 2022, Zrazhevskiy stated "We look forward to expanding our cooperation."

b. On March 29, 2022, Mironova represented to BTG that MIRA had placed a purchase order for 100,000 units of Thyrosafe and asked BTG to advise on the schedule for that order.

c. On April 12, 2022, Mironova represented that MIRA would take a full 200,000 units in July.

d. That same day, Mironova further represented that MIRA had a "multimillion (10 MM - 15MM)" request for CBRN equipment relating to Poland and Ukraine, and that Thyrosafe would be a complementary product to offer with MIRA's masks. This representation further conveyed that MIRA had substantial potential downstream demand for Thyrosafe outside ordinary retail purchases.

e. On May 12, 2022, Mironova represented that MIRA would take 100,000 units in July, wanted a smaller amount sooner because MIRA was "sold out," and also planned to take the remaining 100,000 units by the end of the year. Mironova contemporaneously provided sales figures for February, March, April, and May 2022 to support MIRA's stated demand.

f. On June 23, 2022, Mironova represented that MIRA was building marketing campaigns around Thyrosafe to maximize sales.

g. On September 28, 2022, Mironova further asserted that MIRA had "never lowered" its purchase order below 100,000 units, had "showed a commitment early this year," and expected BTG not to allocate inventory MIRA claimed was reserved for it to other dealers.

h. On October 7, 2022, Mironova represented that, because of then-current events, MIRA was "pretty much sold out" of everything BTG had shipped, that MIRA needed 100,000 units immediately, and that BTG/SERB should plan to move approximately 300,000 units total.

i. On October 13, 2022, Mironova represented that MIRA could "defiantly" [sic] take an additional 100,000 units in addition to the approximately 75,000 units BTG had already identified, and stated that "things will continue to escalate and that helps sales a lot."

j. On October 20, 2022, Mironova represented that MIRA could take an additional 100,000 units "asap" and "highly suggest[ed]" that Defendants keep at least 300,000 units in stock as a yearly threshold.

k. On October 31, 2022, MIRA submitted a purchase order for 250,000 units that it wanted to receive "asap," together with an estimated quantity for the following year.

l. On October 31, 2022, Mironova confirmed that a 900,000-unit annual figure was "very reasonable," explaining that if Defendants could not ship 250,000 units in November or December 2022, then 650,000 units would remain as MIRA's estimate for 2023.

m. On November 4, 2022, Mironova further stated that the planning table "look[ed] good," recommended ordering 250,000 units in January rather than splitting the quantity into smaller batches, and reiterated that MIRA needed 250,000 units "asap" because it was essential to have stock going into the holiday period.

109. Counterclaim Defendants' representations were material because Defendants relied on those representations in planning supply, manufacturing, inventory, distribution, and logistics arrangements.

110. Defendants relied on these representations by communicating MIRA's stated needs to SERB, requesting and attempting to secure additional production and allocations for the United States market, building shipment plans around MIRA's requested quantities, and shifting priorities in response to MIRA's stated urgency.

111. For instance, in September and October 2022, BTG repeatedly informed MIRA that it was communicating MIRA's forecasted needs to SERB for supply planning, that SERB was reviewing global demand, and that without MIRA's input BTG could not be certain it was requesting enough supply for the United States market.

112. BTG specifically informed MIRA that it had worked with colleagues in Europe to shift priorities for global demand to meet MIRA's request and that substantial time and resources had been spent by multiple individuals in BTG's organization to satisfy MIRA's stated needs within the timeframe MIRA required.

113. Further, after MIRA communicated substantially increased demand figures in October 2022, BTG informed MIRA that the numbers being discussed were of a "significant magnitude different to historical sales," and that BTG had provided information to its internal team regarding potential increased production.

114. Counterclaim Defendants' representations were false or misleading when made, or were made recklessly without knowledge of their truth.

115. Counterclaim Defendants knew or recklessly disregarded that their volume representations were false or misleading because MIRA did not intend to purchase the volumes it represented and instead intended to develop, sell, and promote its own competing potassium iodide product.

116. After inducing Defendants to allocate, request, and ship large quantities of Thyrosafe, they attempted to recast their prior purchase orders and demand representations as nonbinding forecasts. For example, on December 15, 2022, Mironova wrote that MIRA wanted to return 100,000 to 150,000 units, stated that demand had slowed "tremendously," and asserted that the "projected POs were sent to estimate the yearly demand." Mironova also claimed that the PO was "just guidance for a forecast" and that MIRA should not be held to those quantities.

117. Mironova's statements in December 2022 were inconsistent with MIRA's prior written representations that it urgently needed large quantities of Thyrosafe, including MIRA's October 7 request for 100,000 units immediately, its recommendation that BTG/SERB plan to move approximately 300,000 units total, its October 31 request for 250,000 units "asap," and its November 4 statement that it needed 250,000 units as soon as possible going into the holiday period.

118. In the alternative, Counterclaim Defendants made the volume representations recklessly without knowing whether MIRA could or would purchase the volumes represented, while intending Defendants to rely on those representations.

119. Counterclaim Defendants also concealed or failed to disclose that MIRA was developing or preparing to sell a competing potassium iodide product while it was inducing Defendants to accommodate MIRA's alleged demand for Thyrosafe.

120. Counterclaim Defendants had a duty not to make partial, misleading, or materially incomplete representations concerning their volume demands and future purchases while omitting that MIRA was preparing to substitute its own competing product for Thyrosafe.

121. Counterclaim Defendants intended for Defendants to rely on their representations.

122. Counterclaim Defendants intended to induce Defendants to reorganize and adjust their supply chain, manufacturing, allocation, inventory, forecasting, logistics, and distribution arrangements to accommodate MIRA's stated volume demands.

123. Defendants actually and justifiably relied on Counterclaim Defendants' representations.

124. Defendants' reliance was reasonable because Counterclaim Defendants' representations concerned specific purchase volumes, forecasts, order commitments, and stated demand for Thyrosafe, and because MIRA, Zrazhevskiy, and Mironova were requesting that Defendants accommodate those represented volumes.

125. In reliance on Counterclaim Defendants' representations, Defendants reorganized supply-chain arrangements, changed manufacturing and inventory planning, allocated or reserved product and capacity, adjusted logistics, and incurred inventory, supply-chain, and related costs.

126. MIRA did not purchase the represented volumes.

127. Instead, MIRA developed, sold, and promoted its own competing potassium iodide product, used false and misleading statements regarding FDA approval and FDA-related imagery to promote that competing product, and ceased purchasing Thyrosafe.

128. Counterclaim Defendants' conduct caused Defendants damages, including lost sales, lost profits, lost commercial opportunities, inventory and supply-chain costs, reliance damages, reputational injury, and other damages to be proven at trial.

129. Counterclaim Defendants' fraudulent conduct was knowing, intentional, malicious, or grossly negligent, entitling Defendants to exemplary damages under applicable law.

130. Defendants are entitled to recover actual damages, exemplary damages, interest, costs, and all other relief to which they are entitled.

**COUNT V**
**UNFAIR COMPETITION UNDER TEXAS LAW**
**DEFENDANTS v. MIRA, ZRAZHEVSKIY, AND MIRONOVA**

131. Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

132. Counterclaim Defendants engaged in unfair competition under Texas law by making false and misleading FDA-related advertising statements to promote MIRA's competing potassium iodide product.

133. Counterclaim Defendants' unfair competition also included using the alleged Thyrosafe exclusivity relationship as leverage while MIRA was developing, selling, and promoting a competing potassium iodide product.

134. Counterclaim Defendants' conduct was deceptive, misleading, and contrary to honest practices in industrial and commercial matters.

135. Counterclaim Defendants' conduct was intended to give MIRA an unfair competitive advantage over Defendants and Thyrosafe.

136. Counterclaim Defendants' misleading statements and FDA-related advertising created the false or misleading impression that MIRA's competing potassium iodide product was FDA approved.

137. Counterclaim Defendants' conduct was likely to mislead consumers, Amazon purchasers, distributors, wholesale customers, and other market participants concerning the regulatory status, nature, quality, characteristics, or approval status of MIRA's competing potassium iodide product.

138. Counterclaim Defendants' conduct was also likely to divert sales away from FDA-approved Thyrosafe and toward MIRA's non-FDA-approved competing product.

139. Counterclaim Defendants' conduct misappropriated or exploited marketplace goodwill associated with FDA-approved potassium iodide products and unfairly diverted commercial benefits to MIRA.

140. Counterclaim Defendants' conduct also included claiming or invoking alleged Thyrosafe exclusivity while simultaneously selling a competing potassium iodide product through overlapping channels and inducing Defendants to accommodate MIRA's claimed volume demands.

141. Counterclaim Defendants' conduct was willful and intentional.

142. BTG and SERB suffered direct competitive and commercial harm as a result of Counterclaim Defendants' unfair competition.

143. Defendants' damages include lost sales, lost profits, loss of goodwill, diversion of customers, supply-chain and inventory costs, reputational harm, and other damages to be proven at trial.

144. Defendants are entitled to damages, disgorgement, injunctive relief, corrective advertising, costs, interest, attorneys' fees where recoverable, and all other relief to which they are entitled.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**
**DEFENDANTS v. MIRA, ZRAZHEVSKIY, AND MIRONOVA**

145. Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

146. Defendants had a reasonable probability of entering into business relationships with consumers, Amazon purchasers, distributors, wholesale customers, and other purchasers and sellers in the potassium iodide market.

147. Those prospective relationships included sales of FDA-approved Thyrosafe.

148. Counterclaim Defendants knew of Defendants' existing and prospective business relationships in the potassium iodide market.

149. Counterclaim Defendants knew that Thyrosafe competed with MIRA's potassium iodide product.

150. Counterclaim Defendants knew that consumers and distributors purchasing potassium iodide tablets for emergency preparedness would consider FDA approval material to their purchasing decisions.

151. Counterclaim Defendants acted with a conscious desire to interfere with Defendants' prospective business relationships, or knew that interference was certain or substantially certain to occur as a result of their conduct.

152. Counterclaim Defendants interfered with Defendants' prospective business relationships by misleading consumers and market participants into believing that MIRA's competing potassium iodide product was FDA approved.

153. Counterclaim Defendants' conduct was independently tortious or unlawful because it constituted false or misleading advertising under the Lanham Act, unfair competition under Texas law, and fraud or fraudulent inducement as alleged herein.

154. Counterclaim Defendants' conduct proximately caused injury to Defendants.

155. Counterclaim Defendants' conduct diverted sales and market opportunities from Defendants and FDA-approved Thyrosafe to MIRA's non-FDA-approved competing potassium iodide product.

156. Defendants suffered actual damages and losses as a result of Counterclaim Defendants' interference, including lost sales, lost profits, loss of goodwill, reputational harm, lost market opportunities, inventory and supply-chain costs, and other damages to be proven at trial.

157. Defendants are entitled to recover damages from Counterclaim Defendants in an amount to be determined at trial, together with interest, costs, and all other relief to which they are entitled.

**JURY DEMAND**

158. Defendants demand a trial by jury on all claims, counterclaims, issues, and defenses so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counter-Plaintiffs BTG International, Inc. and SERB SA respectfully request that the Court enter judgment in their favor and against Plaintiff/Counterclaim Defendants MIRA Safety LLC, Roman Zrazhevskiy, and Tanya Mironova and award the following relief:

a. actual damages;

b. lost profits;

c. reliance damages;

d. disgorgement of MIRA's profits;

e. exemplary damages on Defendants' fraud claim;

f. preliminary and permanent injunctive relief requiring Counterclaim Defendants to remove misleading FDA-related imagery, insignia, statements, and advertising concerning MIRA's competing potassium iodide product;

g. preliminary and permanent injunctive relief prohibiting Counterclaim Defendants from stating, suggesting, implying, or otherwise representing that MIRA's competing potassium iodide product is FDA approved;

h. corrective advertising sufficient to inform consumers and market participants that MIRA's competing potassium iodide product is not FDA approved;

i. up to three times the amount of Defendants' actual damages in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a));

j. pre-judgment and post-judgment interest;

k. costs of suit;

l. attorneys' fees to the extent recoverable by law; and

m. all other relief, at law or in equity, to which Defendants are justly entitled.

STEVENS & LEE

Date: October 15, 2026

By: */s/ Jason P. Rudloff*

Jason P. Rudloff *(admitted pro hac vice)*
620 Freedom Business Center
Suite 200
King of Prussia, PA 19406
(215) 751-2882
jason.rudloff@stevenslee.com

*Attorneys for Defendants/Counterclaim Plaintiffs BTG International, Inc. and SERB SA*

## CERTIFICATE OF SERVICE

I certify that on October 15, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all counsel of record.

*/s/ Jason P. Rudloff*
Jason P. Rudloff